**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| PATRICIA H. MCKINNEY *et al*., | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 08-0333 (RMU) |
| | : | | |
| v. | : | Re Document Nos.: | 39, 46 |
| | : | | |
| UNITED STOR-ALL CENTERS LLC | : | | |
| *et al*., | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

**DENYING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING PLAINTIFF
MCKINNEY'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.  INTRODUCTION

This matter is before the court on the defendants' motion for summary judgment and

plaintiff Patricia McKinney's cross-motion for partial summary judgment.  The plaintiffs,

Patricia McKinney and Darryl Robinson, were employed as the Primary Managers of self-

storage facilities owned and operated by the defendants.  They allege that the defendants failed to

pay them overtime wages to which they were entitled, in violation of the Fair Labor Standards

Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*.  The defendants move for summary judgment, arguing

that as "administrative" and "executive" employees, the plaintiffs were statutorily exempted

from the FLSA's overtime requirements.  Defendant United Stor-All Centers LLC ("USAC")

also moves for summary judgment on the grounds that the plaintiffs were employed solely by

United Stor-All Management LLC ("USAM") and not by USAC, and that USAC is therefore not

a proper party to this action.  Plaintiff McKinney has filed a cross-motion for partial summary

judgment, contending that no reasonable jury could conclude that she was an "executive"

employee for purposes of the FLSA.

The court concludes that there exist genuine issues of material fact regarding the defendants' assertion that the plaintiffs fall within the "administrative" exemption to the FLSA's overtime requirements.  Accordingly, the court denies summary judgment to the defendants on this issue.  The court further concludes that the defendants have failed to demonstrate the absence of a genuine issue of material fact concerning whether the plaintiffs were "executive" employees.  In fact, the evidence adduced plainly demonstrates that plaintiff McKinney did not fall within the "executive" exemption.  Thus, the court denies summary judgment to the defendants on this issue and grants plaintiff McKinney's cross-motion for partial summary judgment.  Lastly, the court concludes that a genuine issue of fact remains as to whether USAC had an employment relationship with the plaintiffs.  Accordingly, the court declines to dismiss USAC from the litigation at this juncture.

## II.  FACTUAL & PROCEDURAL BACKGROUND

### A.  The Plaintiffs' Job Responsibilities

In March 2003, plaintiff McKinney was hired as the Primary Manager of Uptown Self-Storage, a self-storage facility operated by USAM.  Defs.' Statement of Material Facts Not in Dispute ("Defs.' Statement") ¶ 12.  Uptown Self-Storage's principal business involved the leasing of storage units and rental trucks to customers.  Pls.' Opp'n to Defs.' Mot. for Summ. J. and Cross-Mot. for Partial Summ. J. ("Pls.' Opp'n") at 11.  From late February 2005 to January 2008, McKinney allegedly worked an average of sixty hours per week.  *Id*. at 4.  During this period, McKinney's annual salary ranged from approximately $34,500 to $42,600.  Defs.' Statement ¶¶ 9-12.  In addition, McKinney was provided with a rent-free apartment on the

premises of Uptown Self-Storage with an estimated rental value of $900 per month.  Defs.' Mot.,

Ex. 3 (Decl. of Cathy Avery-Pugh) ("Avery-Pugh Decl.") ¶ 13.

In 2005, plaintiff Robinson became the Primary Manager of Fullerton Self-Storage,

another self-storage facility operated by USAM.  Defs.' Statement ¶¶ 54-55.  Robinson alleges

that from September 2005 to September 2008, he worked approximately forty-five hours per

week.  Pls.' Opp'n at 4.  During this period, Robinson earned between approximately $34,000

and $36,000 per year.  Defs.' Statement ¶ 70.

As set forth in the "Position Description" created by the plaintiffs' employer, a Primary

Manager's duties fell into roughly four categories: (1) Sales, Marketing and Customer Service;

(2) Administration; (3) Custodial and Maintenance; and (4) Leadership/Supervision.  Defs.'

Mot., Ex. 5 ("Position Description") at 1-2.  The first category of responsibilities required

Primary Managers to "[a]chieve[] lease-up objectives by utilizing effective advertising,

telephone techniques, and direct interactions with potential customers," "[p]romote[] and

maintain[] excellent customer relations by providing information and resolving problems

effectively and in a timely fashion," "[c]reate[] and implement[] [an] annual marking plan,

spending at least ½ day per week on approved marketing activities" and "[r]ecommend[]

marketing strategies based on competitive information, maintaining market studies, and analysis

of local business opportunities."  *Id*. at 1.

The Primary Manager's "Administrative" responsibilities included "[m]anaging cash and

balancing receipts," "[m]aking collections, posting payments, and . . . daily bank deposits" and

"[f]ollow[ing] up on delinquent accounts."  *Id*.  Primary Managers were also required to prepare

"such management, marketing, operational or other reports as required in [the Operations

Manual] or as required from time to time by the District Manager" and to accurately utilize computer systems and accounting records. *Id.*

The Primary Manager's "Custodial and Maintenance" duties included "[v]isually inspect[ing] the store daily" and "respond[ing] to potential breach of security problems," "[m]onitor[ing] security systems," "[e]nsur[ing] the cleanliness and orderliness standards are met in the office, restrooms and grounds and that vacant units are cleaned on a timely basis . . . [which] means doing the work him/herself whenever necessary" [and] "[p]erform[ing] minor repairs needed at the facility." *Id.*  Primary Managers were required to "[k]eep the premises in a neat and clean condition, the grounds free of debris, and the landscaped areas free of weeds." *Id.* at 1-2.

As for "Leadership/Supervision," the Primary Managers were responsible for the "effective training and supervision of Assistant Manager(s) [to ensure] that the facility [was] properly managed in his/her absence." *Id*. at 2.  In addition, the Primary Manager was responsible for the "recruiting, hiring, training and motivation of subordinates." *Id.*

The Primary Manager was the highest level employee at each facility and reported to an off-site District Manager.  Defs.' Mot. at 4-5.  The Primary Manager was required to have "[f]requent and regular contacts with [his or her] supervisor [and] Home Office Personnel." Position Description at 2.  In addition, each Primary Manager was provided with an extensive Operations Manual.  *See* Pls.' Opp'n at 2 & Ex. 7 ("Operations Manual").  As discussed in more detail below, the Operations Manual provided detailed instructions on how each Primary Manager was to fulfill his or her responsibilities.  *See generally id*.

McKinney states that she spent approximately forty percent of her time on customer sales and service, forty-five percent of her time on maintenance, five percent of her time on marketing

activities and ten percent of her time on staff management.  Pls.' Opp'n at 1 & Ex. 5 (Affidavit

of Patricia McKinney) ("McKinney Aff.") ¶ 3.  Robinson testified that he spent approximately

fifty percent of his time on customer sales and service, thirty percent of his time on maintenance,

five percent of his time on marketing and fifteen percent of his time on "administrative

management/facility management."  *Id*. at 1-2, Ex. 2 (Dep. of Darryl Robinson) ("Robinson

Dep.") at 142-43.

McKinney asserts that for the bulk of her tenure, she supervised one full-time Assistant

Manager, though she supervised a second full-time employee on occasion.  *Id*. at 4; *see also*

Defs.' Mot., Ex. 1 (Aff. of Carol Shipley) ("Shipley Aff.") ¶ 31.  Robinson supervised two

Assistant Managers for all but a five month period, during which time he supervised three to four

Assistant Managers.  *See also* Shipley Aff. ¶ 32.  The day-to-day responsibilities of the Assistant

Managers largely mirrored those of the Primary Managers.  *Id*.

In 2006, Robinson was appointed as the Senior Primary Manager for his district, which

encompassed the State of Maryland.  Defs.' Statement ¶¶ 57-60.  As Senior Primary Manager,

Robinson had additional responsibilities, such as training other Primary Managers in his district.

*Id*. ¶¶ 61.  He received an additional $100 per month as Senior Primary Manager.  *Id*. ¶ 59.

## B.  Relationship Between USAC and USAM

USAM is owned sixty-five percent by USAC and thirty-five percent by Carol Shipley,

who also serves as USAM's president.  Pls.' Opp'n at 26; Shipley Aff. ¶ 3.  USAM provides

property management services to storage facilities owned by USAC.  Shipley Aff. ¶ 6.  The two

entities share payroll systems, human resources systems, accounting employees and a common

website.  *Id*. at 26-27.  Yet the two entities have separate main offices.  *Id*. at 26.  Furthermore,

the defendants assert – and the plaintiffs do not dispute – that USAC did not own the Uptown

and Fullerton facilities, did not perform any services at the USAM facilities, did not supervise the plaintiffs' work and did not have the authority to hire or fire the plaintiffs.  Shipley Aff. ¶¶ 12-13; *see* Pls.' Opp'n at 25-27.

### C.  Procedural History

Plaintiff McKinney commenced this action individually and on behalf of others similarly situated on February 25, 2008, *see generally* Compl., and filed an amended complaint on June 13, 2008, alleging that the defendants failed to pay her overtime wages as required by the FLSA and failed to pay her for her accrued but unused vacation time as required by D.C. Code § 32-1001,[1] *see generally* Am. Compl.  On September 26, 2008, plaintiff Robinson filed a Consent to Participate in this collective action.  *See* Consent to Participate.  On November 10, 2008, the court granted the plaintiff McKinney's motion to facilitate the identification and notification of additional potential plaintiffs and ordered the defendants to produce a list of all Primary Managers at facilities identified by the plaintiffs.  Order (Nov. 10, 2008).  The defendants filed the instant motion for summary judgment on January 2, 2009.  The plaintiffs opposed the defendants' motion on February 20, 2009, and plaintiff McKinney cross-moved for partial summary judgment on the defendants' claim that she falls within the "executive" exemption to FLSA's overtime requirements.

---

[1]     The defendants assert – and the plaintiffs do not dispute – that plaintiffs' counsel indicated that they would not pursue the claim for unused vacation pay.  *See* Defs.' Mot. at 1 n.1; *see generally* Pls.' Mot.; Pls.' Reply.  Accordingly, the court grants summary judgment to the defendants on this claim.

## III.  ANALYSIS

### A.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338

(D.C. Cir. 2006).  Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."  *Greene*, 164 F.3d at 675.

## B.  Legal Standard for FLSA Overtime Exemptions

The FLSA requires that employers pay their employees one and a half times their "regular rate" for work in excess of forty hours per week, unless they are subject to certain enumerated exemptions.  29 U.S.C. § 207(a).  As relevant here, the FLSA exempts from coverage those individuals "employed in a bona fide executive, administrative, or professional capacity."  *Id.* § 213(a).  These overtime exemptions are "affirmative defense[s] on which the employer has the burden of proof."  *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974); *accord Am. Fed'n of Gov't Employees, AFL-CIO v. Office of Pers. Mgmt.*, 821 F.2d 761, 771 (D.C. Cir. 1987) (noting that "the burden is on the employer to demonstrate the employee is in fact exempt").  The employer's claim that an exemption applies "must be proved by clear and affirmative evidence or the employee must be given coverage under the Act."  *Roney v. United States*, 790 F. Supp. 23, 26 (D.D.C. 1992); *see also Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007) (citing *Roney*, 790 F. Supp. at 26) (noting that "clear and affirmative evidence" requirement does not impose on the employer any heightened evidentiary burden).

It is well-settled that "exemptions from the Act are narrowly construed against the employer in order to further Congress's goal of affording broad federal government protection." *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 50-51 (D.D.C. 2006) (citing *Mitchell v. Ky. Fin. Co.*, 359 U.S. 290, 295 (1959)); *Thomas*, 506 F.3d at 501 (noting that the FLSA exemptions "are to be narrowly construed against the employers seeking to assert them") (quoting *Arnold v. Ben*

*Kanowsky, Inc*., 361 U.S. 388, 392 (1960)); *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1997).  The exemptions are to be applied "only to those clearly and unmistakably within the terms and spirit of the exemption."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1239 (11th Cir. 2008); *Clements v. Serco, Inc*., 550 F.3d 1224, 1227 (10th Cir. 2008) (noting that the employer "bears the burden of proving that the [e]mployees fit plainly and unmistakably within the exemption's terms") (internal quotations omitted).

The Department of Labor ("DOL") has promulgated detailed regulations outlining the criteria for the application of the FLSA exemptions.  *See* 29 C.F.R. §§ 541.100 *et seq*.  "The Department of Labor regulations are entitled to judicial deference and are the primary source of guidance for determining the scope of exemptions to the FLSA."  *Clements*, 530 F.3d at 1227 (quoting *Ackerman v. Coca-Cola Enters*., 179 F.3d 1260, 1264 (10th Cir. 1999)).

At issue here are the "administrative" and "executive" exemptions to the overtime requirement.  *See* 29 U.S.C. § 213(a)(1).  The DOL regulations define an "administrative" employee as an individual:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ;

> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer; and

> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

The regulations provide that an "executive" employee is one:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;

> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

*Id*. § 541.100.

### C.  The Court Denies Summary Judgment to the Defendants on their Assertion of the Administrative Exemption

The defendants contend that both plaintiffs fall within the "administrative" exemption to the statutory overtime requirement.  *See* Defs.' Mot. at 11-26.  The defendants assert that the plaintiffs were the highest-ranking managers at their respective locations, were free from daily supervision by superiors and were responsible for the overall operation and management of their respective facilities.  *Id*. at 16.  The defendants maintain that although the plaintiffs spent a small portion of their time performing manual work, their primary duties involved the management of each facility, which entailed meeting leasing goals, developing and implementing marketing strategies and supervising staff.  *Id*. at 17-20.  In discharging these responsibilities, the plaintiffs allegedly exercised significant discretion, as evidenced by their ability to choose how to deal with delinquent accounts and how to present and maintain their properties to attract new customers.  *Id*. at 23-24.

The plaintiffs sharply dispute the defendants' characterization of their primary job responsibilities.  *See* Pls.' Opp'n at 6-20; 23-25.  The plaintiffs assert that they devoted approximately eighty to ninety percent of their time to "non-management" tasks such as customer sales and service, data entry and custodial tasks.  *Id*. at 7.  The plaintiffs point out that they had few subordinates working under them, and that these employees had virtually the same responsibilities and salaries as the plaintiffs.  *Id*. at 2-4.  Moreover, the plaintiffs assert that nearly every aspect of their job was governed by the detailed procedures set forth in the

Operations Manual, which greatly limited the plaintiffs' discretion in discharging their daily responsibilities. *See id.* at 12-18.

As previously noted, the plaintiffs must satisfy three criteria for the administrative exemption to apply. *See* 29 C.F.R. § 541.200. With respect to the first criterion, there is no dispute that the plaintiffs were paid well above the $455 per week salary threshold. *See* Defs.' Mot. at 3; *see generally* Pls.' Opp'n; Pls.' Reply. The remaining two criteria are addressed in turn below.

**1. There Exists a Question of Fact as to Whether the Plaintiffs' Primary Duty Was the Performance of Work Directly Related to the Management or General Business Operations of the Employer**

The DOL regulations provide that duties "directly related to the management or general business operations of the employer" are those "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201. Examples of such duties include "work in functional areas such as: tax; finance; accounting; budgeting; auditing; insurance; quality controlling; purchasing; procurement; advertising; marketing . . . ; personnel management . . . ; [and] legal and regulatory compliance." *Id.* Whether a particular duty is administrative presents a legal question, whereas the amount of time devoted to administrative duties, and the significance of those duties, are questions of fact. *Reich v. Avoca Motel Corp.*, 82 F.3d 238, 240 (8th Cir. 1996) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

In the instant case, the plaintiffs' duties encompassed a diverse range of responsibilities. *See* Defs.' Mot. at 4; Pls.' Opp'n at 2-4. Many of these responsibilities, such as processing rental applications and payments, entering data into a computer program to generate daily reports,

cleaning bathrooms and hallways and performing other routine maintenance, *see* Pls.' Opp'n at 2-3, were plainly not directly related to management or general business operations, *see* 29 C.F.R. § 541.201.  Other responsibilities, such as supervising staff, formulating marketing strategies, recommending capital improvements and, in the case of Robinson, training other Primary Managers, *see* Pls.' Opp'n at 4, fall squarely within the type of duties listed in the applicable regulation, *see* 29 C.F.R. § 541.201; *see also id*. § 541.203.

Thus, the analysis of this criterion turns on which category of responsibilities constituted the plaintiffs' "primary" duty.  *See id*. § 541.200.  The DOL regulations define the term "primary duty" as "the principal, main, major or most important duty that the employee performs." *Id*. § 541.700.  The "major emphasis" of the inquiry is "on the character of the employee's job as a whole." *Id*.  The regulation lists the following factors as relevant to the "primary duty" analysis:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id*.  Although "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," time spent "is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." *Id*.

### a. The Relative Importance of the Exempt Duties

The first factor listed in the applicable regulation – the relative importance of the exempt duties – requires the court to "compare the importance of the plaintiff's [exempt] duties with the importance of her [non-exempt] duties, keeping in mind the end goal of achieving the overall

success of the company." *See Thomas*, 506 F.3d at 505.[2]  Numerous courts have held that on-site managers responsible for the day-to-day operations of a branch location within a multi-store business have management-related activities as their primary duty.  *See id.* at 504 (holding that a gas station manager's primary duty was management, despite the fact that the bulk of his time was devoted to custodial tasks, because the gas station would cease to function unless he discharged his managerial responsibilities); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1114-15 (9th Cir. 2001) (holding that the managers of a recreational vehicle park had as their primary duty management because their "principal value to [the employer] was directing the day-to-day operations of the park even though they performed a substantial amount of manual labor"); *Moncrief v. Daro Realty, Inc.*, 2005 WL 1119794, at *6-7 (D.D.C. Apr. 28, 2005) (holding that the on-site managers of an apartment complex were "administrative" employees because they managed employees, hired staff and made the day-to-day decisions regarding the management of their facilities).  Thus, the fact that the plaintiffs were the highest ranking employees at each of their facilities and were responsible for the day-to-day operations of their facilities, Defs.' Mot. at 17-18, suggests that their primary duty involved the performance of exempt responsibilities directly related to the management of the business.

Yet as the court in *Thomas* observed, the mere fact that an employee was "in charge" does not necessarily mean that her primary duty involved the exercise of management-related responsibilities.  *Thomas*, 506 F.3d at 503; *cf. Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1263 (11th Cir. 2008) (rejecting the employer's argument that store managers assigned to separate locations categorically fall within the executive exemption because the regulation calls for a fact-intensive primary duty inquiry).  Rather, in *Thomas*, the court weighed the relative

---

[2]    Although *Thomas* concerned the application of the "executive" exemption rather than the "administrative" exemption, both exemptions share the same definition of "primary duty" set forth in 29 C.F.R. § 541.700.  *See* 29 C.F.R. §§ 541.100(b), 541.200(b).

importance of the plaintiff's exempt and non-exempt duties to the functioning of the gas station and concluded that the plaintiff's exempt duties predominated:

> If [the plaintiff] failed to perform her nonmanagerial duties, her Speedway station would still function, albeit much less effectively.  After all, most of us – even if unwillingly – have visited and spent our money at filthy gas stations with sparsely stocked shelves.  If, however, [the plaintiff] failed to perform her managerial duties, her Speedway station would not function at all because no one else would perform these essential tasks.  Surely, a gas station cannot operate if it has not hired any employees, has not scheduled any employees to work, or has not trained its employees on rudimentary procedures such as operating the register.  We therefore conclude that [the plaintiff's] managerial duties were much more important to Speedway's success than her non-managerial duties.

*Id*. at 505.

In the instant case, it is far less clear that the plaintiffs' managerial responsibilities were more important to the success of their employer's business operations than their non-managerial responsibilities.  The defendants have not demonstrated that the Uptown and Fullerton facilities would have ceased to function had the plaintiffs neglected to hire and train their minimal staff (whose duties were allegedly identical to their own), present a "wish list" of capital improvement to their District Managers or formulate marketing strategies (which allegedly comprised a negligible percentage of their daily responsibilities).  *See generally* Defs.' Mot.; Defs.' Reply.  Indeed, given the few employees who staffed each facility as well as the nature of the employer's business, *see* Defs.' Mot. at 17-18, it seems at least as likely that the storage facilities would have ceased to function had the plaintiffs shirked their non-exempt duties to answer phone calls from potential customers, log payments into the software reporting program, assess late fees and perform their custodial and maintenance tasks, *see* Defs.' Mot. at 18.  Thus, on the facts presented in the parties' briefs, the first factor does not weigh in favor of granting the defendants' motion.

### b.  The Amount of Time Spent on Non-Exempt Tasks

Turning to the second factor – the amount of time spent on non-exempt tasks – the plaintiffs have asserted that they devoted eighty to ninety percent of their work time to custodial, maintenance, sales and customer service tasks unrelated to management or general business operations.  Pls.' Opp'n at 1-2.  These assertions, supported by the plaintiffs' sworn testimony, *see* McKinney Aff. ¶ 3; Robinson Dep. at 142-43,[3] must be accepted on summary judgment, *see Baldwin*, 266 F.3d at 1114 (noting that the court "must accept on summary judgment the [plaintiffs'] assertion, supported by the record, that they spent more than fifty percent of the time on manual tasks that are plainly nonexempt").

The DOL regulations, however, expressly state that an employee need not spend more than half his or her time on exempt tasks for those to constitute his or her primary duty.  *See* 29 C.F.R. § 541.700; *cf. Baldwin*, 266 F.3d at 1114 (noting that the executive exemption does not fail "merely because the proportion of time spent on exempt managerial tasks is less than fifty percent, where, as here, managerial duties are packaged in employment with non-managerial tasks, and the management function cannot readily and economically be separated from the nonexempt tasks") (citing *Donovan v. Burger King Corp*., 672 F.2d 221, 226 (2d Cir. 1982) (observing that "one can still be 'managing' if one is in charge, even while physically doing something else")).  Accordingly, there remain significant issues of fact with respect to the second factor of the "primary duty" analysis.

### c.  Freedom From Direct Supervision

The third factor – the plaintiffs' freedom from direct supervision – also yields an inconclusive result on the facts presented.  The defendants assert that the plaintiffs did not have

---

[3]     Although the defendants suggest that the plaintiffs' estimations of the time they spent on various duties lack support in the record, *see* Defs.' Reply at 17, they offer no evidence refuting the plaintiffs' estimations, *see generally id*.

daily supervision by their District Managers, who visited the property only once or twice a month. Defs.' Mot. at 16; Defs.' Reply at 19-20. Yet the frequency with which the District Managers physically visited each facility is not decisive of their level of supervision, as the defendants acknowledge that the plaintiffs "could contact their supervisors by phone or email," Defs.' Reply at 19, and have introduced no evidence suggesting that the District Managers did not keep in close contact with their Primary Managers through these methods, *see generally* Defs.' Mot.; Defs.' Reply. To the contrary, the Position Description offered by the defendants plainly states that each Primary Manager was required to have "[f]requent and regular contacts with [his or her] supervisor [and] Home Office Personnel." Position Description at 2. In addition, Primary Managers were required to obtain prior approval from their District Managers for any discounts, specials or promotions, *see* Operations Manual at 45, for making petty cash purchases above $50, *see id.* at 69, for any action not listed in the Operations Manual to resolve a customer complaint, *see id.* at 16, or for the waiver of any late fee or creation of a customer payment plan, *see* Pls.' Dep. at 91, undermining the defendants' assertion that the Primary Managers had only infrequent contacts with their District Managers. Accordingly, the court concludes that there remain significant issues of fact with respect to the plaintiffs' freedom from direct supervision.

### d.  Salary Comparison to Non-Exempt Employees

The final factor in the primary duty inquiry involves a comparison of the plaintiffs' salaries to the salaries of their non-exempt employees. 29 C.F.R. § 541.700. Although the defendants argue that it is improper to perform the salary comparison on a per hour basis, Defs.' Reply at 21, the sole authority the defendants rely on for that proposition supports precisely the opposite conclusion, *see Thomas*, 506 F.3d at 508-09. The court in *Thomas* began by taking the

plaintiff's weekly salary and dividing that amount by the number of hours she allegedly worked per week to calculate the plaintiff's hourly pay rate of $10.44. *Id*. Noting that it was "surprising" that "neither party . . . established the hourly wage paid to the subordinate employees," the court accepted the plaintiff's allegation that her subordinates earned $7.00 per hour. *Id*. The court concluded that the plaintiff's hourly pay rate of $10.44 was approximately thirty percent higher than that earned by her subordinates, and that that disparity was sufficient to indicate that the plaintiff's primary duty was to perform exempt tasks. *Id*.

McKinney asserts that her full-time Assistant Manager, Stephany Fludd, was paid between $31,500 and $35,000 during the relevant period. Pls.' Aff. ¶¶ 4-7. Assuming a forty hour work week and fifty-two work weeks per year, Fludd's hourly pay rate was between $15.14 and $16.83. McKinney's annual salary ranged from approximately $34,500 to $42,600 over the same period. Defs.' Statement ¶¶ 9-12. In addition, McKinney was provided with an apartment with an estimated rental value of $900 per month and estimated monthly utilities of $50 per month, which resulted in an additional benefit of $11,400 per year. Avery-Pugh Decl. ¶ 13. Assuming that McKinney worked sixty hours per week,[4] her hourly pay rate was between $14.71 and $17.31. Thus, on an hourly basis, there is practically no discrepancy between the salaries earned by McKinney and her subordinate.

Turning to plaintiff Robinson, the court notes that Robinson's subordinates earned approximately $22,800 per year, or – assuming a forty hour work week – $10.96 per hour. *See* Pls.' Opp'n at 4. Robinson's hourly pay rate, assuming that he worked forty-five hours per week as he has alleged, ranged between $14.53 and $15.38. *See* Defs.' Statement ¶ 70; Pls.' Opp'n at 24 n.5. As a result, Robinson earned approximately twenty-five to twenty-nine percent more than his Assistant Managers. This disparity provides some support for the defendants' assertion

---

[4]     McKinney asserts that she typically worked in excess of sixty hours per week. Pls.' Opp'n at 2.

that Robinson's primary duty was directed to management-related responsibilities. *See Thomas*, 506 F.3d at 509 (holding that a thirty percent salary gap on a per hour basis was a significant disparity).

### e. Conclusion

With respect to McKinney, the court is not persuaded that any of the "primary duty" factors cuts decisively in the defendants' favor. Accordingly, the defendants have failed to demonstrate that McKinney's primary duty was directly related to the management or business operations of the employer.

As for Robinson, the fact that he earned significantly more than his non-exempt subordinates provides some support for the defendants' invocation of the administrative exemption. Yet given the inconclusiveness of the other three factors, as well as the fact that the FLSA exemptions are to be construed narrowly and applied only to those unmistakably within their parameters, *see Morgan*, 551 F.3d at 1239, the court determines that the salary disparity alone would not preclude a reasonable jury from concluding that Robinson's primary duty was not directly related to the management of the employer's business.

The authorities relied on by the defendants do not persuade the court to reach a different result. *See* Defs.' Mot. at 11-13. The apartment building managers in *Moncrief v. Daro Realty, Inc.*, a decision cited by the defendants, supervised sixteen to twenty employees, interviewed and hired a wide variety of employees, such as desk clerks, porters and maintenance men, had the power to terminate their subordinates if necessary, handled eviction proceedings and had the authority to determine what repairs were needed and to hire outside contractors to make those repairs. 2005 WL 1119794, at *2-3. Furthermore, there is no indication that the plaintiffs in *Moncrief* spent a significant portion of their work time on custodial or non-managerial duties.

*See generally id.* Similarly, the motel managers in *Reich v. Avoca Motel Corp.* were responsible for interviewing, hiring, managing and training housekeepers and desk clerks and "would often make suggestions and recommendations to [the owner] concerning the method of operation of the motels." 82 F.3d at 239. Furthermore, although the motel managers spent a portion of their time on custodial and non-managerial tasks, there is no indication that these tasks comprised a regular or central part of their responsibilities. *See id.* (observing that "[t]he time spent doing laundry, taking reservations, and checking in guests was proportional to the volume of business – more when it was good and less when it was slow").

Indeed, *Moncrief* and *Avoca Motel* are no more on point than *Jarrett v. ERC Properties, Inc.*, 211 F.3d 1078 (8th Cir. 2000). The employer in *Jarrett* sought to overturn a jury verdict that the manager of an apartment complex was not an administrative employee for purposes of FLSA. *Id.* at 1080. The Circuit noted that the plaintiff's duties included:

> collecting applications from prospective tenants; verifying references and other application information; contacting potential applicants regarding apartment availability; preparing 'reports,' which she described as filling in blanks on printed forms; writing receipts and verifying rent payments; performing minor repairs and getting help for repairs she could not do; picking up trash; maintaining the grounds; cleaning the laundry room, bathrooms, and community room; locking and unlocking common rooms according to a schedule determined by her supervisor; and forwarding invoices to [her employer] for payment.

*Id.* at 1082. Noting that "[t]hese tasks resemble[d] the work of non-exempt 'bookkeepers, secretaries, and clerks of various kinds [who] hold the run-of-the-mine positions in any ordinary business," the court concluded that the jury's determination that the plaintiff's primary duty was not directly related to management or business operations to be well supported by the record. *Id.*

Accordingly, the court holds that a reasonable jury could conclude that the plaintiffs' primary duty was not directly related to the management or general business operations of the

employer.  The court, therefore, denies summary judgment to the defendants on their assertion of

the administrative exemption.

> **2. There Exists a Question of Fact as to Whether the Plaintiffs' Primary Duty**
> **Included the Exercise of Discretion and Independent Judgment**
> **With Respect to Matters of Significance**

To fall within the executive exemption, the employee's primary duty must also involve

the exercise of discretion and independent judgment with respect to matters of significance.  29

C.F.R. § 541.200.  The DOL regulations provide a long list of factors relevant to this inquiry,

including: whether the employee has the authority to formulate, affect, interpret, or implement

management policies or operating practices; whether the employee has the authority to commit

the employer in matters that have a significant financial impact; whether the employee has the

authority to waive or deviate from established policies and procedures without prior approval;

and whether the employee has authority to negotiate and bind the company on significant

matters.  *Id.*

The DOL regulations provide that the "exercise of discretion and independent judgment

must be more than the use of skill in applying well-established techniques, procedures or specific

standards described in manuals or other sources."  *Id.*  Thus, the regulations clarify that

> [t]he use of manuals, guidelines or other established procedures containing or
> relating to highly technical, scientific, legal, financial or other similarly complex
> matters that can be understood or interpreted only by those with advanced or
> specialized knowledge or skills does not preclude exemption under [29 U.S.C. §
> 213(a)(1)].  Such manuals and procedures provide guidance in addressing difficult
> or novel circumstances and thus use of such reference material would not affect
> an employee's exempt status.  The [§ 213(a)(1)] exemptions are not available,
> however, for employees who simply apply well-established techniques or
> procedures described in manuals or other sources within closely prescribed limits
> to determine the correct response to an inquiry or set of circumstances.

*Id.* § 541.704.

Like other Primary Managers, the plaintiffs were given an Operations Manual, which provided detailed instructions and procedures for the completion of the majority of the everyday tasks performed by the Primary Manager. *See generally* Operations Manual. For instance, with respect to sales and customer service, the Operations Manual addressed how to greet the customer,[5] what questions to ask, the steps involved in making the "sales pitch," and how to close the sale. *Id*. at 5-7. The Operations Manual also laid out the actions that a Primary Manager could take in response to a customer complaint, such as reimbursing a customer for his or her dry cleaning expenses for clothing damaged by a leaky roof. *Id*. at 16. The Primary Manager's authority to provide compensation, however, was limited to $100. *Id*. at 17. If the actions set forth in the Operations Manual did not resolve the complaint, the matter was referred to a District Manager. *Id*. at 16. The Operations Manual also detailed the step-by-step procedures for collecting rental payments, sending out late notices[6] and processing foreclosures. *Id*. at 19-27. The plaintiffs assert that the Operations Manual precluded any deviations from the procedures with respect to late payments and foreclosure activities. Pls.' Opp'n at 13.

In addition, the Operations Manual detailed the Primary Manager's daily, weekly and monthly reporting requirements. Operations Manual at 27-30. For instance, the Operations Manual provided step-by-step instructions on the preparation of computer-generated "Daily Financial Reports" reflecting the financial transactions that occurred each day. *Id*. at 28. The Primary Manager was also responsible for generating a weekly "Walk-Thru Report," which

---

[5]     The Operations Manual provides that "Good morning/afternoon, thank you for calling _____, this is _____, how may I help you?" is the "required greeting at all United Stor-all owned and operated facilities . . . . Let the phone ring twice, pick up a Customer Lead Card, smile, and let the caller hear your passion." Operations Manual at 5.

[6]     The plaintiffs note that late notices were computer-generated and automatically sent out to the client, and that late fees were automatically applied to accounts by the computer system. Pls.' Opp'n at 13.

reflected the status of the facility and was pulled automatically by the District Manager each week.  *Id*. at 29.

The Operations Manual also detailed the Primary Manager's responsibilities with respect to the finances of each facility.  *Id*. at 68-71.  The Primary Manager assisted the District Manager in developing an annual operating budget by reviewing rental activity for the prior year, calling vendors for any cost increases and providing a list of potential capital improvements.  *Id*. at 68-69.  Each facility was provided a petty cash fund of at least $300 and the Primary Manager was responsible for ensuring that all petty cash receipts were properly itemized.  *Id*. at 69.  Purchases over $50 required prior approval from the District Manager.  *Id*.

The Operations Manual set forth the procedures for the routine maintenance of each facility.  *Id*. at 37-41.  For instance, the Operations Manual provided a recommended list of cleaning items to be kept on a maintenance cart[7] and set forth a precise cleaning schedule for each area of the facility.[8]  The Operations Manuals further provided that "day to day maintenance is the responsibility of both the Primary Manager and Assistant Managers" and that "USAM encourages facility personnel to complete minor repairs."  *Id*. at 39-40.

The Operations Manual thus greatly limited the discretion and independent judgment exercised by Primary Managers, both by prescribing detailed procedures for the completion of nearly all day-to-day tasks and by requiring that Primary Managers defer to District Managers on most matters of significance to the business.  *See generally id*.

---

[7]     "Use a four wheel cart that can be easily pushed or a golf cart.  There should be brackets and supports to hold everything properly in the cart."  *Id*. at 37.

[8]     "Restrooms are to be cleaned daily," "[h]allways and stairs should be inspected daily and thoroughly cleaned (mopped) at least once a week" and "[w]indows and doors are cleaned at least once a month."  *Id*. at 38.

The defendants rightly point out that the Operations Manual did not dictate every aspect of the Primary Manager's duties. *See* Defs.' Reply at 25-27. For instance, the defendants note that the Operations Manual did not provide a script that the plaintiffs were required to follow when communicating with a delinquent customer, and obviously did not address every possible question or concern that could be raised by a potential or existing customer.[9] *Id.* Indeed, it is clear that the existence of an operating manual does not categorically eliminate the existence of meaningful employee discretion. *Cf. Donovan*, 675 F.2d at 521.

Nonetheless, the plaintiffs have at least raised an issue of fact as to whether they truly exercised discretion and independent judgment with respect to matters of importance to the business in light of the limitations imposed by the Operations Manual. *Cf. Morgan*, 551 F.3d at 1249-51 (concluding that store managers did not exercise managerial discretion in part because the store manual strictly prescribed the manner for completing practically all tasks assigned to them). Accordingly, the defendants' motion with respect to their assertion of the administrative exemption fails on this ground as well.

### D. The Court Denies Summary Judgment to the Defendants and Grants Summary Judgment to Plaintiff McKinney on the Issue of the Executive Exemption

The defendants also argue that the plaintiffs fall within the "executive" exemption to FLSA's overtime requirements. *See* Defs.' Mot. at 27-31. The defendants point out that the plaintiffs were the highest ranking employees at their respective facilities, and were responsible for supervising and training employees. *Id.* at 27-28. The defendants also contend that in one instance, plaintiff McKinney reduced an employee from full-time to part-time status because he

---

[9]     The defendants suggest that plaintiff McKinney spearheaded the idea to rent parking spaces at her facility to a nearby rental car business. Defs.' Mot. at 18. The plaintiffs contend that in reality, the rental car company approached McKinney about renting some spaces, and that McKinney took the matter to the facility owners, who made the decision to enter into the agreement. Pls.' Opp'n at 16-17.

was unable to manage his workload.  *Id*. at 28-29.  In addition, the defendants assert that the

plaintiffs were responsible for "ensuring compliance with state and local laws" when auctioning

off property in connection with a nonpaying account.  *Id*. at 29.

The plaintiffs maintain, as they did in connection with "administrative" exemption, that

their primary duty involved customer service and maintenance tasks unrelated to the

management of the business.  *See* Pls.' Opp'n at 21.  In addition, plaintiff McKinney asserts that

she is entitled to summary judgment on the defendants' assertion of the executive exemption

because she did not customarily and regularly direct the work of two or more employees, as

required under the DOL regulations.  *Id*. at 21-23.  Specifically, McKinney asserts that she only

supervised two full-time employees for 29.5 weeks of the 150 week claim period, or nineteen

percent of the claim period.  *Id*. at 22.

The defendants oppose plaintiff McKinney's partial motion for summary judgment,

arguing that even if McKinney did not regularly supervise two or more employees, she had the

authority and budget to hire a second employee but chose not to do so.  Defs.' Reply at 29-30.

The defendants, however, do not dispute that McKinney only supervised a second full-time

employee for nineteen percent of the claim period.  *See generally id*.

As previously noted, to fall within the executive exemption, the plaintiff must be

compensated on a salary basis at a rate of not less than $455 per week, have as his or her primary

duty the management of the enterprise, customarily and regularly direct the work of two or more

other employees and have the authority to hire or fire other employees or make suggestions as to

such issues that have particular weight.  29 C.F.R. § 541.100.  There is no dispute that the

plaintiffs satisfy the salary threshold.  *See* Pls.' Opp'n at 20.  Nor do the plaintiffs contest the fact

that their hiring and firing recommendations received deference from their District Managers.

*See id.* at 20-25.  The two remaining criteria are addressed in turn below.

### 1. There Exists a Question of Fact as to Whether the Plaintiffs Had as Their Primary Duty the Management of the Business

The DOL regulations provide that the term "management" includes, but is not limited to,

activities such as

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees . . . planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.  The term "primary duty" has the same definition in the executive

exemption context that it does in the administrative exemption context, and refers to the

"principal, main, major or most important duty that the employee performs."  *Id.* § 541.700.  As

in the administrative exemption context, the amount of time spent on management tasks is not

dispositive of whether an individual's "primary duty" involved management of the business.  *Id.*

Rather, the court should consider "the relative importance of the exempt duties as compared with

other types of duties; the amount of time spent performing exempt work; the employee's relative

freedom from direct supervision; and the relationship between the employee's salary and the

wages paid to other employees for the kind of nonexempt work performed by the employee."  *Id.*

As discussed above, the plaintiffs have raised an issue of fact as to whether their primary

duty involved the performance of non-exempt activities – such as customer service, data entry

and custodial and maintenance tasks – rather than management-related duties.  *See supra* Part

III.C.1.  Indeed, the plaintiffs have asserted that they spent a marginal amount of their time

supervising or hiring subordinates, that there was little difference between their responsibilities and those of their subordinates, that they had limited authority and frequent contacts with their supervisors and that the vast majority of their time was spent on routinized tasks involving no managerial discretion.[10]  *Id*.  The defendants have presented little evidence that activities such as interviewing and selecting employees, setting or adjusting rates of pay or hours of work, appraising employees' productivity and efficiency or disciplining employees, *see* 29 C.F.R. § 541.102, predominated among the plaintiffs' job responsibilities, in terms either of time expended or importance to the employer, *see generally* Defs.' Mot; Defs.' Reply.  Accordingly, because the defendants have failed to demonstrate the absence of a genuine issue of material fact as to the nature of the plaintiffs' primary duty, the court denies summary judgment to them on the executive exemption.

### 2.  Plaintiff McKinney Did Not Customarily and Regularly Direct the Work of Two or More Employees During the Claim Period and is Therefore Entitled to Summary Judgment on the Executive Exemption Claim

The phrase "customarily and regularly" means "a frequency that must be greater than occasional but which, of course, may be less than constant."  29 C.F.R. § 541.701.  Courts have declined to set bright-line rules regarding what constitutes "customarily and regularly."  *See Morgan*, 551 F.3d at 1276.  Yet, courts have typically construed the regulation to require an individual to supervise two or more full-time employees at least seventy-five to eighty percent of the time.  *See id*. at 1275 (holding that the trial court did not err in requiring an eighty percent threshold for the customarily and regularly" requirement); *Sec'y of Labor v. Daylight Dairy Products, Inc*., 779 F.2d 784, 788 (1st Cir. 1985) (affirming the trial court's determination that

---

[10]     Although Robinson indicates that he spent fifteen percent of his time on "administrative management/facility management" compared to ten percent for McKinney, Pls.' Opp'n at 1-2, the court is not persuaded that this five percent difference obviates the existence of a genuine issue of material fact as to Robinson's primary duty.

supervising two or more employees seventy-six percent of the time falls short of the customarily and regularly requirement); *Perez v. Radioshack Corp.*, 552 F. Supp. 2d 731, 741-42 (N.D. Ill. 2005) (holding that an eighty percent standard "comports with the regulatory direction that 'customary and regular' signifies a frequency greater than occasional but less than constant"); *cf. Murray v. Stuckey's, Inc.*, 50 F.3d 564, 568 (8th Cir. 1995) (rejecting the seventy-six percent ruling in *Daylight Dairy* and concluding that supervision of two full-time employees 98.2% of the time easily satisfies the standard); *Jackson v. Go-Tane Servs., Inc.*, 56 Fed. Appx. 267, 272 n.8 (7th Cir. 2003) (stating that "where the supervised employees work 'full time' only 67% of the time over the relevant time period, such amount of supervision falls short of the 'regular and customary' supervision of full-time employees").

There is no dispute that Robinson customarily and regularly supervised the work of two or more full-time employees.  Pls.' Opp'n at 20.  Yet there is also no dispute that McKinney supervised two full-time employees only nineteen percent of the time.  *See id.* at 22; *see generally* Defs.' Reply.  Although the defendants contend that the "unusual circumstances" of this case, in which McKinney could have hired a second full-time employee for the duration of the claim period but did not do so, warrant a "less rigid application" of the customarily and regularly requirement, Defs.' Reply at 29-30, a determination that McKinney customarily and regularly directed the work of two or more full-time employees, when she had a second full-time employee less than twenty percent of the time, would represent a major departure from the plain language of the regulation as applied by nearly every court to address the issue.  No reasonable jury could conclude that McKinney customarily and regularly directed the work of two or more full-time employees.  Therefore, the court grants summary judgment to her on the executive exemption.

### E.  There Exists a Question of Fact as to Whether USAC Stood in a Joint Employment Relationship to the Plaintiffs

Defendant USAC contends that USAM was the plaintiffs' sole employer and that USAC should therefore be dismissed from this lawsuit.  Defs.' Mot. at 10-11.  The plaintiffs respond that USAC and USAM constituted an integrated business enterprise and that as a result, both can be held liable for violations of FLSA's overtime protections.  Pls.' Opp'n at 25-27.

Liability under FLSA's overtime provisions exists only if there is an employer-employee relationship.  *See* 29 U.S.C. § 207; *Ivanov v. Sunset Pools Mgmt. Inc.*, 567 F. Supp. 2d 189, 194 (D.D.C. 2008) (holding that a defendant could not be held liable for overtime violations because the undisputed facts demonstrated that it was not the plaintiffs' employer).  An individual may, however, have a joint employment relationship with more than one employer.  *See* 29 C.F.R. § 791.2.  The DOL regulations provide that "all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek."  *Id.*

The regulations further provide that

[w]here the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) *Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.*

*Id.* (emphasis added); *see also Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 915-16 (9th Cir. 2003) (holding that two entities that both provided home health services, were controlled by the same individual and shared administrative and managerial personnel were not completely dissociated and therefore were joint employers of the plaintiff).

The plaintiffs have offered evidence that USAC is a sixty-five percent owner of USAM, that USAC and USAM are both in the business of operating self-storage facilities and that the two entities share officers, employees, a common payroll system, a common human resources department and accounting personnel. Pls.' Opp'n at 26-27. The interrelatedness of this relationship raises an issue of fact as to whether USAC and USAM were not completely disassociated such that the plaintiffs had a joint employment relationship with both entities.

The defendants argue that the court should rely on the four-factor "economic reality" test to determine whether an employment relationship existed between USAC and the plaintiffs. Defs.' Mot. at 10-11. The "economic reality" test directs the court to consider whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Ivanov*, 567 F. Supp. 2d at 194 (citing *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001)). The defendants argue that because only USAM had the power to hire and fire the plaintiffs, supervised and controlled their work schedules and conditions of employment, determined their rate of pay and method of payment and maintained their employment records, USAM was the plaintiffs' sole employer. Defs.' Mot. at 11.

Yet as one court has explained, the "economic reality" test "applies only to circumstances in which a company has contracted for workers who are directly employed by an intermediary

company." *A-One Med.*, 346 F.3d at 917 (holding that the relevant regulations guide the analysis of the purported employment relationship in cases of "horizontal" joint employment rather than the "economic reality" test); *accord Davidson v. Orange Lake Country Club, Inc*., 2008 WL 254136, at *4 n.3 (M.D. Fla. Jan. 29, 2008) (noting that "this case involves allegations of a 'horizontal' joint employment situation, and therefore the regulatory factors guide this determination" and not the "economic reality" test).  This case involves the type of "horizontal" joint employment relationship in which the "economic reality" test has been held not to be controlling.

At any rate, as the authorities cited by the defendants make clear, although the satisfaction of the traditional factors of the "economic reality" test can be *sufficient* to establish an employment relationship, a positive finding on those four factors is not *necessary* to establish such a relationship.  *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 143 (2d Cir. 2008).  Indeed, the court should extend the inquiry beyond these traditional factors if the circumstances so require.  *Ivanov*, 567 F. Supp. 2d at 194; *Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008) (observing that although the traditional "economic reality" factors "are certainly relevant in deciding whether an employer-employee relationship exists, it would be foolhardy to suggest that these are the *only* relevant factors, or even the most important").  Under the circumstances of this case, it would be appropriate to consider the interrelationship between USAC and USAM were the court to assess the "economic reality" of the relationship between USAC, USAM and the plaintiffs.

Thus, there exists a question of fact as to whether USAC was part of a joint employment relationship with the plaintiffs.  Accordingly, the court denies USAC's motion for summary judgment on these grounds.

**IV.  CONCLUSION**

For the foregoing reasons, the court denies the defendants' motion for summary judgment and grants plaintiff McKinney's cross-motion for partial summary judgment.  An Order consistent with this Memorandum Opinion is issued on the 21st day of September, 2009.


RICARDO M. URBINA
United States District Judge